## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**LEON LOVESS**
1717 Lorman St.
Baltimore, Maryland 21217

     *Plaintiff*

v.

**AKAL SECURITY, INC.**
Principal Office:
P.O. BOX 1197
Santa Cruz, New Mexico 87567

Resident Agent:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street
Suite 820
Baltimore, MD 21202

     *Defendant*

**Case No. 19-1389**

## COMPLAINT AND JURY TRIAL DEMAND

     COMES NOW PLAINTIFF, Leon Lovess, by and through undersigned counsel, and files this Complaint, and sues the Defendant Akal Security, Inc. and as cause states:

### NATURE OF ACTION

1.    This is an action by Plaintiff, Leon Lovess (hereafter "Mr. Lovess" or "Plaintiff"), to redress actions taken by Defendant, Akal Security (hereafter "Defendant" or "Akal"), based upon discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e; and Title I of the Civil Rights Act of 1991. Plaintiff brings this action to correct unlawful employment practices on the bases of sex and retaliation.

## PARTIES

2.  Plaintiff resides at 1717 Lorman Street, Baltimore, MD 21217.

3.  Defendant is a large private employer, and is incorporated under the laws of New Mexico, and headquartered in New Mexico.

4.  Defendant states on its LinkedIn profile that it is the largest provider of contract Judicial Security services, protecting federal courthouses in 40 states and specializes in providing security for critical federal government facilities, state and local government agencies and military installations.

5.  Defendant conducts business in the state of Maryland.

6.  Based on information and belief, the company employs over 10,000 people and has at all relevant times had at least fifteen (15) employees doing business within Maryland.

7.  At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. § 2000e(b), (g) and (h).

## JURISDICTION AND VENUE

8.  Jurisdiction of the Court is proper pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq., and 28 U.S.C. §§ 1331, 1337, 1343(a)(3) and 1391.

9.  The unlawful actions complained of are the result of employment practices by Defendant, whose place of business is located in the state of Maryland, and occurred in the state of Maryland.

10. Venue is appropriate because the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Maryland.

11.  Plaintiff has timely complied with any and all conditions precedent and jurisdictional prerequisites to filing suit.

12.  Plaintiff filed a complaint of discrimination against the Defendant with the Maryland Commission on Civil Rights (MCCR) on March 12, 2015.

13.  Plaintiff signed and completed the charge forms with MCCR on April 28, 2015.

14.  MCCR mediation was scheduled and occurred on or about Friday, August 21, 2015, at 10:00 am. However, a resolution was not reached.

15.  MCCR assigned Investigator Lisa Kelly to the case on September 1, 2015.

16.  A fact-finding conference occurred on or about October 19, 2015.

17.  Plaintiff filed an amendment to the charge of discrimination on March 28, 2016.

18.  MCCR issued a Written Finding on November 17, 2017, in which it found probable cause that Defendant engaged in discrimination based on gender.

19.  On December 7, 2017, Plaintiff filed a letter with the Equal Employment Opportunity Commission (EEOC) requesting a Substantial Weight Review.

20.  Subsequently, and subject to a work sharing agreement, the EEOC Baltimore Field Office took the case into its inventory for continued processing on February 16, 2018.

21.  The EEOC issued a Notice of Failure to Conciliate, dated February 21, 2019.

22.  The EEOC issued a Notice of Right to Sue, dated February 21, 2019.

23.  Plaintiff exhausted any and all administrative remedies, including filing a charge of discrimination with the MCCR before filing suit.

## FACTS

24.  Plaintiff worked as a security guard for Akal Security between July 2014 and October 2015.

25. Plaintiff worked on a contract that Defendant had with the Maryland Aviation Commission (MAA) at the Baltimore/Washington Thurgood Marshall Airport (BWI).

26. In or about August 2014, Ms. Sheila Sims (Ms. Sims) joined Akal and became Plaintiff's supervisor.

27. Ms. Sims subjected the Plaintiff to sexual harassment from November 2014 until July 2015.

28. Plaintiff reported the sexual harassment to other company management officials, yet the managers failed to take proper corrective actions.

29. On November 17, 2014, Ms. Sims showed the Plaintiff pictures of herself in bikinis and scantily clad outfits while they were on a lunch break at the base command.

30. On November 18, 2014, while on a lunch break, Ms. Sims told the Plaintiff, and other Officers, that she had been celibate for six years, that she "would eat [Ofc. Brown] alive if he wasn't so young," and made additional inappropriate references to sexual acts.

31. On November 22, 2014, the Plaintiff was working in Area A, Tower 2, when Ms. Sims came by to do a post inspection. Ms. Sims began inappropriately flirting with the Plaintiff, and said things like "are you trying to make my last name 'Lovess'," and "can we be girlfriend and boyfriend?"

32. On or around November 22, 2014, Mr. Sherman Tomlin (Mr. Tomlin), a manager at Akal, told the Plaintiff that Ms. Sims was interested in pursuing a relationship with him.

33. Plaintiff told Ms. Sims that he was not interested in her, and that he wished Ms. Sims would stop hitting on him.

34. Plaintiff told Mr. Tomlin that he wanted Ms. Sims to just act as his supervisor and allow him to just remain an officer.

35. Ms. Sims began sending the Plaintiff inappropriate text messages.

36.  Plaintiff decided to get management involved again on November 22, 2014, and met with
     Mr. Tomlin, Ms. Tyesha Harvey (Ms. Harvey) and Mr. Michael Bias (Mr. Bias) to discuss
     Ms. Sims's sexual harassment. During the meeting, Mr. Tomlin laughed at the Plaintiff. Ms.
     Harvey said she would talk to Ms. Sims. Still, the harassment continued.

37.  On or around November 25, 2014, Ms. Sims told the Plaintiff that she was tired of sleeping
     in her king sized bed alone, and when she heard that the Plaintiff was looking for a new
     housing arrangement, she offered to let the Plaintiff move in with her.

38.  On November 25, 2014, Ms. Sims asked the Plaintiff if he would take an HIV test so that
     they could have sex; Ms. Sims offered to purchase a test kit from Rite Aid Pharmacy.

39.  Ms. Sims also asked Ms. Michelle Ford (Ms. Ford), Plaintiff's co-worker, for background
     information about the Plaintiff, including his living arrangements, finances, and sexual
     orientation. Ms. Ford told Ms. Sims to leave the Plaintiff alone.

40.  In or about December 2014, Plaintiff met Ms. Sims for dinner one night to let her down
     nicely and inform her that he was not interested in pursuing a romantic or sexual
     relationship with her. After turning her down, Ms. Sims began to both retaliate against the
     Plaintiff and continue the sexual harassment.

41.  On or about December 4, 2014, Ms. Sims began to spread false rumors about the Plaintiff,
     including telling individuals that the Plaintiff was an alcoholic and that he had performed
     oral sex on Ms. Sims. Ms. Sims further told people in great detail that she thought the
     Plaintiff had performed the oral sex poorly and was unable to bring her to orgasm.

42.  Ms. Sims also began telling people that the Plaintiff had a small penis, and began referring
     to him as "Officer Ding-a-Ling" instead of "Officer Lovess" in reference to his allegedly
     small penis.

43. Ms. Ford witnessed Ms. Sims stating that Ms. Sims had sex with Plaintiff and that he had an "incubator size dick."

44. Mr. Ahmad Davis-El (Mr. Davis-El) witnessed Ms. Sims stating that Plaintiff was an alcoholic.

45. On December 5, 2014, Ms. Sims approached Plaintiff at his shift, verbally abused him and falsely accused the Plaintiff of abandoning his post when he was 5-10 feet away from his duty station, even though the company policy only requires people to be within 25 feet of their duty station.

46. On December 22, 2014, Ms. Sims falsely told the Plaintiff that Mr. Tomlin wanted to see him in the office. When Plaintiff arrived at the office, he was met by Ms. Sims who scolded and yelled at him in front of everyone there.

47. Plaintiff immediately met with Mr. Tomlin again to discuss the incidents that had been occurring during the previous weeks.

48. After an incident on December 25, 2014, where Ms. Sims had attempted to get Plaintiff in trouble, the Plaintiff informed Mr. Tomlin that the harassment he endured from Ms. Sims had gotten too out of control, and if management would not address it, he would need to hire an attorney.

49. Management continued to fail to properly address the harassment.

50. On January 19, 2015, Mr. Paul Robinson (Supervisor) overheard the Plaintiff telling a co-worker that he believed that Mr. Robinson was picking on him because he had complained about Ms. Sims. Mr. Robinson was the Plaintiff's supervisor and a close friend of Ms. Sims. Mr. Robinson started a fight with the Plaintiff. Mr. Robinson yelled at the Plaintiff "You got something to say to me, say it to my fucking face." During this incident Mr. Robinson had

advanced on the Plaintiff and was pointing his fingers in the Plaintiff's face inches away from his eyes.

51. Plaintiff completed and submitted to Mr. Jackson an Incident Report on January 19, 2015, outlining the foregoing events that occurred that same day. The Incident Report also stated that Supervisor M. Harris and Manager M. Bias also became involved in this event.

52. In response, Mr. Jerry Hankins, Human Resources Manager, proposed disciplining the Plaintiff for telling a coworker that he thought Mr. Robinson was picking on him in retaliation for his complaints about Ms. Sims. Mr. Hankins told the Plaintiff that if it happened again he could face a written warning or a suspension.

53. On April 23, 2015, Ms. Sims made comments to Ms. Judy Sorrell (Ofc. Sorrell) an employee at Akal, about the alleged small size of the Plaintiff's penis. Ms. Sims referred to Plaintiff as "that small Dick" and used her hand to show Ofc. Sorrell the size of Plaintiff's penis.

54. Ms. Sims proceeded to badmouth Plaintiff, saying he lived in a hotel and was homeless.

55. Ofc. Sorrell completed and submitted an Incident Report on April 23, 2015, outlining the foregoing events that occurred that same day.

56. The Incident Report was reviewed by Theresa Scott (Ms. Scott) on April 25, 2015.

57. Ofc. Sorrell also witnessed Ms. Sims stating that Ms. Sims had oral sex with Plaintiff. Ms. Sims would make these comments commonly in the Defendant's bathroom for any employee to hear.

58. On May 24, 2015, the Plaintiff endured humiliation at the hands of Mr. Bias (manager), Mr. Jackson (manager), Ms. Sims (supervisor), D. Sullivan (supervisor), and D. Randall

(supervisor) when he entered roll call and was asked, based on his time in the Army, if the Army or the Marines "ate pussy the nastiest."

59.  Plaintiff completed and submitted to Mr. Jackson an Incident Report on May 25, 2015, outlining the foregoing events that occurred on May 24, 2015.

60.  On May 25, 2015, Mr. Jackson came over to the Plaintiff and stated that he had nothing to do with the prior referenced conversation and the Plaintiff explained to him that this is why he initially complained to him and other managers about sexual harassment before, but that the managers just laughed at him.

61.  On July 17, 2015, the Plaintiff worked the 2nd shift and volunteered to take the 3rd shift; however, he was relieved of his duty due to post fulfillment. When the Plaintiff was off duty he fell asleep waiting for his bus and was awakened by Ms. Sims. Ms. Sims escorted the Plaintiff to base command and confiscated his ID. Ms. Sims never asked the Plaintiff if he was off duty; however, she took photos of the Plaintiff and told other coworkers that he was homeless.

62.  At base command, Supervisor Harris asked if the Plaintiff was working. Plaintiff responded that he had been off for 3 hours, which was verified by Supervisor Harris. Mr. Jackson stated that Ms. Sims should have asked if Plaintiff was working before escorting him to the office.

63.  Plaintiff completed and submitted to Mr. Jackson an Incident Report on July 17, 2015, outlining the foregoing events that occurred that same day.

64.  The Incident Report was reviewed by Eric Hardy on July 17, 2015.

65.  On October 18, 2015, Plaintiff was working as a Perimeter Rover from 2:30 p.m. to 11:00 p.m. while training two other officers on the duties of the position.

66. Plaintiff and the other officers traveled in the vehicle to go to a nearby Royal Farms on Camp Meade Rd. to get some food while on lunch break.

67. Plaintiff was in his work vehicle with the two other officers, one of whom was Supervisor Lamar Carr's brother.

68. While on their way to the Royal Farms, Mr. Tomlin observed the Plaintiff and the other officers.

69. The office made a call over the radio to request that the car at Royal Farms on Camp Meade Rd. call into the office.

70. Upon calling into the office, Plaintiff was subsequently instructed to return to their post.

71. Based on information and belief, other officers frequented the Royal Farms on Camp Meade Rd. during lunch breaks.

72. On October 27, 2015, Plaintiff was falsely accused by Mr. Robinson of leaving work early while working on an overtime shift after he had covered all the posts for lunch breaks.

73. Plaintiff had been drafted to work overtime during the overnight shift.

74. Plaintiff was tasked with providing relief to approximately five (5) officers, one at a time, so that each could take their lunch breaks.

75. At approximately 7:00 am, Plaintiff returned to the office after having provided relief to each of the officers.

76. Mr. Ira Harris (Mr. Harris) was in the office working on paperwork.

77. Ms. Scott and Mr. Robinson were also present in the office.

78. Plaintiff informed his managers that he had completed his rounds to provide relief to the other officers so they could take their lunch breaks.

79. Plaintiff was instructed by Ms. Scott to give her the keys to his duty vehicle.

80. Mr. Harris told the Plaintiff that he was free to leave and go home because he knew that Plaintiff had to be back at work for his regularly scheduled shift at 2:00 pm.

81. When Plaintiff returned at 2:00 pm for his shift, Mr. Robinson told Plaintiff that Mr. Hankins wanted to speak with him.

82. Prior to Plaintiff entering Mr. Hankins's office, Mr. Harris and Ms. Scott informed Plaintiff that they observed Mr. Robinson telling Mr. Hankins that the Plaintiff left work without approval earlier that morning.

83. Mr. Harris and Ms. Scott also told Plaintiff that they informed Mr. Hankins that Mr. Harris released the Plaintiff from work earlier that morning and that Ms. Scott requested that Plaintiff return the keys to his duty vehicle because he had completed his rounds.

84. During the meeting with Mr. Hankins, Plaintiff was issued a Notice indicating that he was placed on unpaid administrative leave and removed from the schedule pending further notice.

85. Plaintiff ceased working for Defendant as of October 27, 2015.

86. Plaintiff was constructively terminated from his position as of October 27, 2015.

87. Defendant contends that it determined that Plaintiff would be terminated in November/December 2015 and notified him of his termination in April 2016.

88. Plaintiff never received any notification of his termination.

89. These actions constitute violations of both Title VII of the Civil Rights Act of 1964 and Md. Code Ann. State Govt. § 20-601 *et seq.*, as asserted in the following Counts.

**Count I**
**Sexual Harassment/Hostile Work Environment**
**(42 U.S.C. § 2000e(a))**

90. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

91. Defendant discriminated against the Plaintiff in violation of Section 703(a) of Title VII, 42 U.S.C. §2000e-2(a), by subjecting him to sexual harassment and creating a hostile work environment because of his sex, and failing to take proper corrective action.

92. The offensive conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for the Plaintiff.

93. As a Manager, Mr. Bias's actions constitute the actions of the Defendant for which they are directly liable.

94. As a Manager, Mr. Jackson's actions constitute the actions of the Defendant for which they are directly liable.

95. As a Supervisor, Ms. Sims's actions constitute the actions of the Defendant for which they are directly liable.

96. As a Supervisor, Mr. Robinson's actions constitute the actions of the Defendant for which they are directly liable.

97. As a Supervisor, D. Sullivan's actions constitute the actions of the Defendant for which they are directly liable.

98. As a Supervisor, D. Randall's actions constitute the actions of the Defendant for which they are directly liable.

99. As a Supervisor, M. Harris's actions constitute the actions of the Defendant for which they are directly liable.

100. Defendant failed to take reasonable measures to prevent and promptly correct sexually harassing behavior in the workplace.

101. Defendant knew of, or in the exercise of reasonable care should have known of, the hostile or offensive work environment suffered by the Plaintiff because of his sex.

102. Plaintiff repeatedly complained to management about the hostile or offensive work environment, but Defendant failed to take timely preventative or remedial actions.

103. The effect of the practices complained of above has been to deprive the Plaintiff of equal employment opportunities and otherwise has adversely affected his employment status because of his sex.

104. The unlawful employment practices complained of above were intentional.

105. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Plaintiff.

106. Plaintiff has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

**Count II**
**Harassment/Disparate discipline/Retaliation**
**(42 U.S.C. § 2000e-3(a))**

107. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

108. Defendant unlawfully retaliated against Plaintiff in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3 (a), by discriminating against him for filing a charge of discrimination and opposing unlawful employment practices, including sexual harassment.

109. Plaintiff opposed the sexual harassment by the Defendant's supervisors and managers at the BWI airport and suffered adverse terms and conditions of employment because of his opposition to the same.

110. Plaintiff complained to management about the sexually hostile work environment and suffered adverse terms and conditions of employment because he complained to management.

111. For example, after the Plaintiff refused to comply with Ms. Sims's sexual advances, he was laughed at by management officials, berated by Mr. Robinson, subjected to undue scrutiny, suspended indefinitely, constructively discharged and ultimately terminated.

112. The effect of the practices complained of above has been the deprivation of the Plaintiff's equal employment opportunities and has adversely affected his status as an employee because he opposed unlawful employment practices.

113. The unlawful retaliatory employment practices complained about above were intentional.

114. The unlawful retaliatory employment practices complained about above were done with malice or with reckless indifference to the federally protected rights of the Plaintiff.

115. Plaintiff has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

**<u>Count III</u>**
**Constructive Discharge/Termination**
**(42 U.S.C. §§ 2000e-2(a), 2000e-3(a))**

116. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

13

117. Plaintiff was constructively discharged by Defendant on October 27, 2015, when he was removed from the schedule indefinitely in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), and Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

118. Plaintiff was constructively discharged because of the sexual harassment he endured and the Defendant's failure to prevent or remedy the hostile work environment.

119. Plaintiff was constructively discharged in retaliation for filing his charge of discrimination and his opposition to unlawful employment practices.

120. Defendant indicated that it terminated the Plaintiff for a violation of their policy when he took the Defendant's vehicle off property to go to Royal Farms to obtain food while he was supposed to be performing security duties.

121. Based on information and belief, other officers, including the two that he was in the car with on October 18, 2015, have visited Royal Farms on Camp Meade Rd. during breaks and not been subjected to any discipline.

122. Defendant also stated that it removed Plaintiff from the schedule for leaving prior to the end of his holdover shift on October 27, 2015.

123. Plaintiff was told by his managers, Mr. Harris and Ms. Scott, that he could go home because he had completed his rounds.

124. Mr. Robinson knew Plaintiff was given approval to leave work that morning.

125. Mr. Robinson falsely told Mr. Hankins that Plaintiff left work early without authorization.

126. Mr. Harris and Ms. Scott told Mr. Hankins that Plaintiff was given approval to leave work that morning.

127. Plaintiff never received any notification of his termination.

128. Plaintiff was terminated because of the sexual harassment he endured and the Defendant's failure to prevent or remedy the hostile work environment.

129. Plaintiff was terminated in retaliation for filing his charge of discrimination and his opposition to unlawful employment practices.

130. The effect of the practices complained of above has deprived the Plaintiff of his equal employment opportunities and adversely affected his status as an employee because of his sex and opposition to unlawful employment practices.

131. The unlawful employment practices complained about above were intentional.

132. The unlawful employment practices complained about above were done with malice or with reckless indifference to the Plaintiff's federally protected rights.

133. Plaintiff has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendant and requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, successors, assigns, and all persons in active concert or participation with it from engaging in any employment practice which discriminates on the bases of sex, including sexual harassment, and from retaliating against employees who oppose unlawful employment practices.

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for men and individuals who oppose unlawful employment practices and which eradicate the effects of Defendant's past and present

unlawful employment practices, including sex discrimination, sexual harassment, and retaliation.

C.  Order Defendant to make whole Plaintiff by providing equitable relief, including but not limited to reinstatement, back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

D.  Order Defendant to make whole Plaintiff by providing compensation for past and future pecuniary economic losses resulting from the unlawful employment practices described in the foregoing paragraphs above, in amounts to be determined at trial.

E.  Order Defendant to make whole Plaintiff by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, frustration, and humiliation, in an amount to be determined at trial

F.  Order Defendant to pay Plaintiff punitive damages for Defendant's malicious and reckless indifference to his federally protected right to be free from sexual harassment and retaliation.

G.  Order Defendant to pay Plaintiff interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action.

H.  Grant such further relief as the Court deems necessary and proper in the public interest.

## **JURY DEMAND**

Plaintiff respectfully requests a jury trial in all claims so triable.

_____/s/_**JASON I. WEISBROT**_____
Jason I. Weisbrot, Esq. (Bar No. 28074)


Respectfully submitted,

SNIDER & ASSOCIATES, LLC

_____/s/_**JASON I. WEISBROT**_____
Jason I. Weisbrot, Esq. (Bar No. 28074)
jason@sniderlaw.com
Jacob Y. Statman, Esq. (Bar No. 16932)
jstatman@sniderlaw.com
Justin M. Womack, Esq. (Bar No. 20588)
Jwomack@sniderlaw.com
Snider & Associates, LLC
Pikesville Plaza Building
600 Reisterstown Road, 7th Floor
Baltimore, Maryland 21208
410.653.9060 (T)
410.653.9061 (F)

*Counsel for Plaintiff*